## HAYS v. PORT OF SEATTLE.

(District Court, W. D. Washington, N. D. September 17, 1915.)

### No. 47.

1. WATERS AND WATER COURSES ⬤⇒158—CONSTRUCTION OF WATERWAY—CONTRACTS.

Laws Wash. 1893, p. 244, § 5, authorizing the construction of a waterway by private contract, and providing that the contractor should have a certain time within which to prepare plans and specifications after notice, it was incumbent upon the contractor, when notified by the Land Commissioner that a certain material was required for the construction of bulkheads, to prepare plans and specifications therefor.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 184, 186–188; Dec. Dig. ⬤⇒158.]

2. CONSTITUTIONAL LAW ⬤⇒121—OBLIGATION OF CONTRACTS—STATE CONSTRUCTION CONTRACTS—"OBLIGATION OF CONTRACT."

Laws Wash. 1913, p. 195, vacating a portion of a waterway, and vesting title thereto in a municipality, is not unconstitutional as constituting an impairment of contract with one having a contract to construct such waterway, in violation of Const. U. S. art. 1, § 10, or of the fourteenth amendment to the federal Constitution, since such act deals only with the subject-matter of the contract, and not with the obligations of the state under such contract; the "obligation of a contract" being the duty of performance.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 285, 304–311, 342–348; Dec. Dig. ⬤⇒121.

For other definitions, see Words and Phrases, First and Second Series, Obligation of Contract.]

In Equity. Action by W. F. Hays against the Port of Seattle, to declare unconstitutional a statute vacating a waterway. Bill dismissed.

Will H. Thompson, of Seattle, Wash., for complainant.
France & Helsell, of Seattle, Wash., for defendant.

NETERER, District Judge. The complainant seeks to declare inoperative and unconstitutional, as violative of the provisions of the federal Constitution, "An act vacating a portion of Smith's Cove waterway in the city of Seattle," approved March 11, 1913 (Laws 1913, p. 195). He alleges in his bill, in substance, that the defendant, Port of Seattle, is a municipal corporation of the state of Washington created by legislative act of the state (Laws 1911, pp. 412–426), by which act the creation of port districts and election of port commis-

sioners is authorized, and further alleges that on the 3d day of August, 1895, the Commissioner of Public Lands, pursuant to an act of the Legislature of Washington (Laws 1893, p. 241) entered into a contract with the complainant, W. F. Hays, and one Frank Shay, for the excavation of that certain public waterway known as Smith's Cove waterway, in Seattle Harbor, and the filling in and raising above high tide of all of the lands covered by said contract situated in said Smith's Cove adjacent to said waterway belonging to the state of Washington; that bond was filed and all of the provisions of the said act complied with; that on the 25th day of July, 1895, Frank Shay, for valuable consideration, sold and assigned to complainant all of his right, title, and interest in and to the application for contract, and in and to any and all contracts made thereunder, and on the 7th day of March, 1896, Frank Shay duly assigned and transferred to complainant all of his right and interest in contract "so modified," and said assignment was filed with and accepted by the bondsmen and by the Commissioner of Public Lands; that on the 4th day of May, 1896, the complainant entered upon the performance of his contract, and commenced driving piles for the construction of the bulkhead as required by said contract, and did other acts in preparation for such work, and on the 5th day of May, while so at work performing his part of said contract, he was notified by the Commissioner of Public Lands of the state of Washington, "as was his right under the law," that he had elected to exercise the right provided by said contract of changing the said form of bulkhead to be used by complainant, under the terms of said contract; and that complainant thereupon ceased operations until plans and specifications should be determined upon.

It is further alleged that by the terms of said contract the state was to furnish certain right of way for the construction of said waterway across the peninsula separating Smith's Cove from Salmon Bay, and that the state failed to provide such right of way; that complainant applied to the Commissioner of Public Lands of Washington from time to time for specifications and a plan of bulkhead practicable for said waterway, and to furnish a right of way across said peninsula, and that at no time was a plan for bulkhead provided or the right of way furnished, and that the state failed to have the tide lands appraised as provided by the act of 1893, and that the defendant the Seattle & Montana Railway Company, known as the Great Northern Railway Company, purchased from the state from time to time, and from divers persons, a large area of said tide lands at their nominal or appraised value, long after the making of the contract aforesaid; and that a conspiracy between the defendant railway company, its officers, agents, and servants, and the commissioners of the defendant port commission, to defeat the contract of the complainant, and as a part of such conspiracy, and in order to escape the payment of said cost of filling said lands, its officers and agents actively assisted and joined with said commissioners, or some of them, in obtaining the enactment into law of the act in issue; that after said act became law the defendant port commission wrongfully took possession of said waterway and has exercised acts of absolute ownership of said waterway without compensation to the complainant; that it has constructed and built along

the sides of said waterway upwards of 10,000 feet of so-called bulkhead, contrary to and different from the bulkhead required by complainant's contract, which complainant will be required to remove in order to perform his contract, adding a necessary cost of at least $8 per lineal foot, to the damage of complainant of at least $80,000; and further states that the defendant port commission has wrongfully, pursuant to said act, constructed in and across said waterway at Garfield street, a distance of 400 feet, a so-called bulkhead, consisting of piles driven therein to great depths and brush interlocked, totally obstructing thereby all navigation of said waterway beyond Garfield street, "which will cost complainant at least the sum of $5,000 to remove," and has wrongfully removed "earth from about one-half of said waterway at the outer end thereof at what is known as deep water, and extended thereon to said Garfield street and placed the same in said waterway at the inner end thereof at and beyond said bulkhead therein at said Garfield street," and "that there were at least 1,500,000 cubic yards of earth so wrongfully removed, taken, and deposited as aforesaid, necessarily entailing an added cost for its removal over and above what it would have cost this complainant of at least seventy-five thousand dollars ($75,000)"; and charges that the act of March 11, 1913, supra, is violative of section 10, art. 1, of the Constitution of the United States, and of article 14, section 1, of the amendments to the Constitution of the United States.

A judgment of nonsuit has been entered in favor of the defendant Seattle & Montana Railway Company, upon the proofs being taken on the part of complainant, and, on motion of complainant, the action dismissed against the Attorney General of the state. The port commission answers, and denies practically all of the allegations of the bill of complaint. It denies that the complainant is entitled to any relief whatever, admits that sundry and divers tracts of tide lands were sold by the state at their appraised value, and admits that since the passage of said act the port of Seattle has engaged in works of harbor improvement. There is no evidence tending to show any conspiracy.

Many objections were urged upon the taking of testimony with relation to the execution of the contract and the respective interest of the parties, and some emphasis placed upon the fact that Shay, at the time of execution of the contract, August 3, 1895, had, on July 25, 1895, disposed of all of his interest in the application for contract, as appears from assignment offered in evidence, and while his name appears signed to the contract, it is admitted upon the trial by W. F. Hays, the complainant, that he signed Shay's name to the contract, claiming that he at that time was the duly authorized attorney in fact of Shay, pursuant to the letter of attorney which is filed in evidence, which, however, shows that it was executed and acknowledged on the 2d day of March, 1896. Reference to the modified contract, which is approved by the Governor, shows that this was signed by Hays, Shay, and Forrest, the Land Commissioner, on the 26th day of February, 1896, being several days prior to the date of the letter of attorney, while the contract originally was signed August 3, 1895. This contract was approved by Governor McGraw on the 7th day

226 F.—19

of March, 1896. Mr. Hays, in signing Mr. Shay's name to the contract, did not sign it as attorney in fact. The bond which was filed in support of this contract, as provided by law, was signed by complainant and by Mr. Hays as attorney in fact for Mr. Shay. It is contended that this contract was in fact never executed by the applicants under the notice and application to fill in these tide lands pursuant to the act of 1893, and, there being no enforceable contract, that no legal proceedings could be taken thereunder. It is further contended by the defendant that the controlling consideration for the execution of the contract in its modified form, which bears the approval of the Governor of the state, and which is necessary to give it vitality, was the recital in the modified contract as executed, which is:

"Whereas, in the opinion of the Governor of the state, it would be detrimental to the interest of the state to enter into a contract with said W. F. Hays and Frank Shay, or with either of them, or with any other person or persons, corporation, or corporations, to excavate the above-mentioned waterway, except upon the express terms and conditions, as the *principal consideration*, that said contractors would undertake at their own cost and free of cost to the United States of America, the state of Washington, the county of King, and the city of Seattle, to excavate the waterway extending from the north end of said waterway and across the peninsula separating Smith's Cove from Salmon Bay, such excavation to be made under the supervision and in accordance to the plans of the engineer to be designated by the state or the United States, said waterway, when excavated, to be owned, possessed, and controlled by the United States of America, or by said state, free of cost to the said state or United States, whenever said state or United States shall demand possession of the same"

—and that the selection of the route for the Lake Washington Canal by the government, other than the route from Salmon Bay to Smith's Cove, eliminated entirely the proposed canal across the peninsula from Smith's Cove to Salmon Bay, and that upon the selection of the route the state declined to further proceed under the contract, and the claimant, likewise realizing and appreciating that the contract for the excavation of the waterway and the extension of the project across the peninsula from Smith's Cove to Salmon Bay was one project, declined to proceed, and he stated, "Every one knew that the government canal was a part of the project and it had to be worked together," and stated to Land Commissioner Calvert that he could not proceed with the contract until the right of way was obtained by the state for the canal. On November 2, 1901, Land Commissioner Calvert wrote to complainant:

"That the state of Washington will not, under any consideration, furnish the right of way over the peninsula as referred to in your modified contract; nor will the state in any way bind itself to pay you the cost of the right of way if obtained by you."

No steps were ever taken by the complainant to compel the state to obtain its right of way; nor did he act under the provisions of the modified contract which authorized him to proceed, obtain the right of way, and perform the excavations necessary to complete the filling of the lands described in the contract and require payment on the part of the state as by the terms and provisions of the contract provided. The provision referred to reads as follows:

"In consideration of the foregoing provisions of the contract as herein modified, the said W. F. Hays * * * hereby further agree and covenant * * * that they will excavate the lands across said peninsula, * * * in so far as said excavation shall be necessary to complete the filling of the lands described in the foregoing contract as herein modified, at their own personal cost and expense, and when the work of such filling and excavation shall have been completed * * * the said W. F. Hays * * * hereby agree to turn over to the state of Washington, or to the United States, either or both, upon its or their demand therefor, * * * said excavation and right of way, free of cost to said state or United States, and clear of any lien or liens thereon, *if the right of way and the privilege of so excavating across the said peninsula shall be accorded to the parties of the second part * * * free and clear of any cost or expense to them therefor.*"

It is contended the phrase "if fair compensation shall be made to them therefor, which compensation, if not mutually satisfactory, shall be submitted to arbitration," authorized the complainant to obtain the right of way and be compensated therefor prior to turning the completed work over to the state or to the national government, and this contention does not appear to be without merit, as clearly the only construction that can be placed upon the language employed would carry such a conclusion. The conclusion reached, as hereafter stated, makes it unnecessary to pass upon the foregoing contentions. It is further contended on the part of the defendant port commission that complainant was required, under the law which authorizes the contract under which he is proceeding, to prepare maps, specifications, etc., with relation to the work for the retaining walls in the waterway, and that, since complainant concedes that it was the right of the Land Commissioner to change the form of bulkhead specified in the original contract, the duty immediately devolved upon the complainant, upon the suggestion of Land Commissioner Forrest, on May 12, 1896, confirmed by letter of June 9th, in which he says:

"You will recall the conversation we had at the Butler Hotel in Seattle on or about May 12th last. In that conversation I told you that Mr. Gillis, engineer for this department, had reported to me that nothing less substantial than a stone bulkhead would answer the purpose in the improvement of Smith's Cove waterway, contemplated by you"

—to prepare and tender specifications covering the work. This duty became more emphatic on November 17, 1898, when Land Commissioner Bridges, by letter, stated that:

"The plans for retaining wall are utterly impracticable and without merit. Owing to the height to which the retaining wall must be built (some 28 feet) along the outer face of the embankment, its exposed position, and the great values dependent on its integrity for their existence, you are hereby notified to submit plans, specifications, and estimates for a stone wall. The retaining wall for the interior of the waterway could, properly, be made of brush on the same plan as the Lake Washington Waterway Company; but for the retaining wall in front, a distance of 9,000 feet, it will require about 200,000 cubic yards of rock; the remaining wall, 5,500 feet, may be of brush after approved plans."

To which, on December 2d following, complainant, in reply, says:

"I beg to state in the first place that, after careful examination of the law under which the contract referred to was entered into with the state and the terms of the contract itself, I am forced to the conclusion that any plan of a stone wall, as suggested in your letter, would entail such an excess of expense upon the lands to be thereby impounded as to amount to a practical confisca-

tion, and unless the burden of expense for such a structure be borne by the state out of some specific fund authorized for such purpose, I cannot see the reason for submitting plans contemplating such a change from the one provided in the contract. If you desire me to furnish plans for a bulkhead, or retaining wall, to increase in point of strength the one provided for in the contract (which experience has shown to be sufficient and practicable for the purposes required under said contract) I shall be pleased to furnish same at the earliest date possible."

On December 17, 1898, complainant again wrote to Commissioner Bridges as follows:

"It was my intention, on Thursday of this week, when in Olympia, to have had a further talk with you relative to the matter of proposed *change* in bulkhead, also as to the *cut* between Salmon Bay and Smith's Cove. Of course you understand that the state imposed as a condition precedent to the Governor's approving the contract that I should *make* that cut, the right of way to be, of course, provided by the state. This has not yet been done, and I would like to do anything I can to have this obtained and settled, as the matter of bulkhead or details as to the work will naturally adjust themselves. I speak of this because I am satisfied that the contract is an entirety, and unless it is susceptible of performance on both the sides of the state as well as myself, its opponents will resort to and obtain injunctive relief."

[1] I think that by the provisions of section 5 of the act under which this contract was authorized (Laws 1893, p. 244) it was incumbent upon the complainant, upon being notified by the Land Commissioner as to the change of bulkhead which was required, *which it is conceded was the Land Commissioner's right*, to furnish plans and specifications pursuant to the suggestion, and especially upon the suggestion of Land Commissioner Bridges, wherein it was specifically pointed out that the retaining wall for the interior of the waterway could properly be made of brush on the same plan as the Lake Washington Waterway Company and that the wall in front for the distance of 9,000 feet would require about 200,000 cubic yards of rock, and that the remaining part of the wall, 5,500 feet, "may be made of brush after approved plans," or to proceed with the work, taking the letter as a modification of the specification in the manner suggested and in connection with the plans and specifications submitted upon the contract; and I believe it was the complainant's duty to do so, and when he failed to proceed with the work in accordance with the suggestions of Commissioner Bridges, within the time limited by law or contract, that he has not now a right to complain. Under this law, and under the contract, the complainant could not merely content himself with an occasional letter or correspondence with reference to the contract and the specifications and indefinitely prolong the contract or keep alive any rights which he may have had. The testimony of Mr. Cryderman, an engineer of many years' experience, and the testimony of Mr. Gillis, his predecessor, both of whom are engineers of renown, was to the effect that nothing less than a stone bulkhead would do, and, upon the suggestion of Mr. Gillis, Land Commissioner Forrest was prompted to make the change, and Mr. Cryderman advised Land Commissioner Bridges; and no fact appears in the evidence which, to my mind, excuses the complainant in not proceeding with the work or being more diligent in the assertion of any right which he may have had. No act appears in the record, done by complainant with relation to this

contract, except application to the Supreme Court, December 16, 1902, for writ of mandamus to compel the Land Commissioner to appraise the tide lands, until November 12, 1914, when a protest to the vacation of Smith's Cove waterway was filed with the Land Commissioner, two days before the beginning of this action, and but little was done prior to that time.

[2] The act which it is sought to have declared unconstitutional (Laws 1913, p. 195) reads:

"An act vacating a portion of Smith's Cove waterway, in the city of Seattle, and vesting the title of the vacated portion in the port of Seattle.

"Be it enacted by the Legislature of the state of Washington:

"Section 1. That all of that portion of the Smith's Cove waterway, in the city of Seattle, north of the southerly line of Garfield street in said city of Seattle, as the same appears upon the plat of said city, be, and the same is hereby, vacated as a waterway of the state of Washington.

"Sec. 2. After the date of the passage and approval of this act, and the time when the same shall become effective, the title to all of that portion of the said Smith's Cove waterway hereby vacated shall be vested in the port of Seattle: Provided, however, that before such vacation shall become effective, or the title to said property shall vest in said port of Seattle, the said port of Seattle shall procure the consent of all owners of property abutting upon the said waterway of said vacation, but the said port of Seattle shall possess no right to acquire any such consent by exercise of the power of eminent domain, or by any proceedings whatever, against the will of any such abutting owner."

By this act, it is contended, the state attempted to repudiate its contract with the complainant, in violation of article 1, section 10, of the federal Constitution, and also in contravention of the fourteenth amendment to the Constitution. I do not think it can be seriously contended that any rights guaranteed by the fourteenth amendment are invaded; nor do I think that this act impairs any of the obligations of complainant's contract. The act deals only with the subject-matter of the contract, and not with any of the obligations. None of the provisions of the contract are in any way referred to or limited. It does vacate a part of the waterway included in the contract of the complainant. It does vest the title to the vacated part of the waterway in the defendant port of Seattle. It in no way limits the obligation of the state under the contract, nor attempts to restrict any of the rights of the complainant with relation to the contractual obligations. The stipulations of the contract are not impaired.

"The term 'obligation' has been treated in extenso by many learned moral and civil writers, and has been somewhat mystified by classification, and its correct use in connection with the various and numerous subjects in which it has been applied has not always been very clearly established; but the term, when used in relation to contracts, is neither mystical nor doubtful, and its meaning is well understood by the lawyers. 'Obligatio ex contractu' and 'obligatio ex juris vinculum' are terms of the Roman law, with well-defined meaning. 'Obligatio' is to bind. Obligation implies a duty, and a duty that may be enforced by law to perform the contract according to its terms. The Constitution of the United States uses the term in this sense when it prohibits the enactment of laws impairing the obligation of contracts." Wachter v. Famachon, 62 Wis. 117, 22 N. W. 160; Words and Phrases, vol. 6, p. 4483.

The obligation of a contract is the duty of performance. It is the binding force, coupled with the means and right of enforcement of

power to compel performance. The obligation of a contract is and can be nothing less than that which obliges a person to perform his contract or repair the injury done by a failure to perform it. It is created by the terms of the agreement, supported by legal and moral principles, and exists in acts of the parties, and is determined by the language employed; and the mode of enforcing emanates from the law-making body which may be exercised at its discretion, within the prescribed limits of the Constitution. Bridge v. Bridge, 11 Pet. 420, 9 L. Ed. 773. The act in issue does not take from the binding force of the contract, nor limit it in its operation, nor take from the means of enforcement or liability to respond in damages for violation of the terms of the contract. All of the obligations of the contract remain, and the act does not attempt to impair them. The most that can be said is that the state vacated a part of the waterway and vested title thereto in the port commission. This may violate rights which accrued under the contract, but it does not impair its obligation. If the rights of complainant have been violated, he must look to the state, and his remedy is open under section 886, Rem. & Bal. Code of Wash. Lord v. Thomas, 64 N. Y. 107; Brown v. Colorado, 106 U. S. 95, 1 Sup. Ct. 175, 27 L. Ed. 132; Caldwell v. Donaghey, 108 Ark. 60, 156 S. W. 839, 45 L. R. A. (N. S.) 721, Ann. Cas. 1915B, 133.

After the passage of this act, the port commission entered upon an extensive improvement, and expended in improvements on its properties on the waterway and adjoining the total sum of $765,535.74. The amount expended on the improvement of the waterway itself, was $142,769.65. The issue tendered is determined by what has been said, and it is not necessary to discuss the good faith or diligence with relation to this contract during the more than 19 years that have elapsed since the Land Commissioners advised "that nothing less substantial than a stone bulkhead would answer."

An order may be presented dismissing the bill.